UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

NELSON TROGLIN            )
                                 )
      *Petitioner,*        )
v.                            )        1:12-cv-111
                                 )        *Judge Curtis L. Collier*
WARDEN ERIC QUALLS,[1]     )
                                 )
      *Respondent.*      )

## MEMORANDUM

Petitioner Nelson Troglin ("Petitioner") filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Court File No. 1). Following a jury trial, Petitioner was convicted of attempted first degree murder of Mike Stafford–a friend of Petitioner's, who, at the time of the attempted murder, was scheduled to testify as a prosecution witness at Petitioner's upcoming murder trial. Petitioner was subsequently sentenced to twenty-four years in the Tennessee Department of Corrections for the attempted murder of his friend. *See State v. Troglin,* No. E2005-02015-CCA-R3-CD, 2006 WL 2633107 (Tenn.Crim.App. Sept. 14, 2006), *perm. app. denied,* (Tenn. Jan. 29, 2007). Petitioner petitions this Court for review of his attempted murder conviction, basing his effort for relief generally on claims of denial of his constitutional rights to effective assistance of counsel and a fair trial.

Bruce Westbrooks ("Respondent"), who was Warden of the facility where Petitioner is housed at the time a response was due, filed an answer to the habeas petition requesting it be dismissed on the basis that some claims are procedurally barred from habeas review and others were

---

[1]     Eric Qualls, who was appointed as Warden of the Bledsoe County Correctional Complex on November 18, 2013, replaced Warden Bruce Westbrooks and is substituted as the respondent in this case. The Clerk is **DIRECTED** to make this substitution on the Court's CM/ECF docket.

properly resolved by the state (Court File No. 4). After the Court granted Petitioner's motion to exceed the twenty-five page limit, he filed a thirty-seven page response arguing against the Respondent's claims of procedural default and reasonableness of the state court's resolutions of the claims (Court File No. 10). The Court was prepared to rule on the habeas petition based on the Answer, Reply, and state court record, but before the Court had the opportunity to do so, Respondent filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure which basically includes the same arguments as the answer (Court File No. 12).

The summary judgment motion appears to be nothing more than a formality, as the motion for summary judgment and Respondent's Answer presents virtually identical arguments for dismissal. In addition, neither party argues, nor does it appear, that the summary judgment standard differs from the review conducted by the Court under Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts; it appears the review is virtually the same upon receipt of the Answer, Reply, and state-court record. For the sake of judicial economy and because any procedural issues can be avoided by assessing Petitioner's claims under Rule 8(a), Respondent's motion for summary judgment which is unnecessary in this case, will be **DENIED as MOOT** (Court File No. 12). Therefore, Petitioner's motion to deny the motion for summary judgment, which includes a buried request for an extension of time in which to respond to the summary judgment motion, will be **DENIED as MOOT** (Court File No. 13).

Based on the Court's review under Rule 8(a), after considering the filings of Petitioner, Respondent's Answer, Petitioner's Reply, the record of the state proceedings, and the applicable law,

for the reasons explained below, the Court concludes an evidentiary hearing is not warranted and

Petitioner's § 2254 petition will be **DISMISSED** (Court File No. 1).


## I.      NON-DISPOSITIVE MOTION

On December 5, 2013, Petitioner filed a motion requesting the Court to mail a copy of its memorandum opinion and judgment order disposing of his case to the legal assistant who is assisting him in this matter (Court File No. 14). In support of Petitioner's motion, he explains he was transferred to the Special Needs Facility in Nashville for a scheduled January 2014 surgery (Court File No. 14). The motion will be **DENIED**, as Petitioner can send his legal assistant a copy of the documents when he receives them from the Clerk of Court (Court File No. 14).

## II.        <u>STANDARD OF REVIEW</u>

A state criminal defendant may obtain federal habeas relief if he can demonstrate he is in custody pursuant to the judgment of a state court in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254. Under Rule 8 of the Rules Governing Section 2254 Proceedings in the United States Districts Courts, the Court is to determine, after a review of the response, the transcript, record of state court proceedings, and the expanded record, whether an evidentiary hearing is required. If a hearing is not required, the district judge may dispose of the case as justice dictates. After carefully reviewing the required materials, the Court finds it unnecessary to hold an evidentiary hearing and disposes of the case as explained below.

Federal courts review decisions of the state courts pursuant to 28 U.S.C. § 2254(d) which is a part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This statute limits a federal district court's jurisdiction to review habeas claims on the merits. In particular, a court considering a habeas claim must defer to any decision by a state court concerning that claim

3

unless the state court's judgment (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1) and (2).

Ordinarily when state courts issue orders denying relief without discussing the applicable law, this Court must "'conduct an independent review of the record and applicable law to determine whether the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented.'" *Brown v. Pitcher*, 19 Fed. Appx. 154 (6th Cir.2001) (unpublished table decision), *available in* 2001 WL 700858, at *2, *cert. denied,* 534 U.S. 1057 (2001) (*quoting Harris v. Stovall*, 212 F.3d 940, 942 (6th Cir. 2000), *cert. denied,* 532 U.S. 947 (2001)). "'That independent review, however, is not a full, *de novo*, review of the claims, but remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA.'" *Palazzolo v. Gorcyca*, 244 F.3d 512, 516 (6th Cir. 2001), *cert. denied,* 534 U.S. 828 (2001) (*quoting Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000), *cert. denied,* 532 U.S. 947 (2001)). *De novo* review is required, however, when a state court incorrectly frames its legal analysis of a claim in light of clearly established Supreme Court precedent. *Williams v. Taylor,* 529 U.S. 362, 396-98 (2000) (analyzing *de novo* the prejudice prong of the *Strickland* test in relating to counsel's errors at sentencing); *Magana v. Hofbauer,* 263 F.3d 542, 551 (6th Cir. 2001) (analyzing *de novo* the prejudice prong of the *Strickland* test because the state court's legal formulation of defendant's burden of proof was not just a reasonable probability but an absolute certainty the outcome of the proceedings would have

4

been different).

Credibility findings made by state courts are entitled to the presumption of correctness. *McQueen v. Scroggy,* 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. denied,* 520 U.S. 1257 (1997), *overruled on other grounds by In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004); *Smith v. Jago,* 888 F.2d 399, 407 (6th Cir. 1989), *cert. denied,* 495 U.S. 961 (1990). A habeas petitioner may rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"). In other words, a state court's factual determinations are presumed correct, absent being rebutted by clear and convincing evidence.

## III.  **PROCEDURAL HISTORY**

Petitioner was convicted of attempted first-degree murder of Mike Stafford ("Mr. Stafford") on July 3, 2001, and was sentenced to twenty-four years in the Tennessee Department of Corrections following a jury trial in the Bledsoe County Circuit Court (Court File No. 1). Petitioner's timely motion for new trial, which has a fairly extensive procedural history that is not important here, was denied on February 7, 2005 [Addendum No. 1, Vol. 2, at 36]. Petitioner pursued a direct appeal to the Tennessee Court of Criminal Appeals. Petitioner's judgment was affirmed by the Court of Criminal Appeals of Tennessee. *State v. Troglin,* E2005-02015-CCA-R3-CD, 2006 WL 2633107 (Tenn. Crim App. Sept. 14, 2006), *perm. app. denied* (Tenn. Jan. 29, 2007).

Petitioner filed a *pro se* petition for state post-conviction relief in Bledsoe County Circuit Court on October 22, 2007 [Addendum No. 3, Vol. 1, at 1-13]. Counsel was appointed on January

5

31, 2008 [Addendum No. 3, Vol. 1, at 14-15] and substitute counsel was appointed on September 22, 2008 [Addendum No. 3, Vol. 1, at 20]. An amendment to the state post-conviction petition was filed by substitute counsel on March 18, 2010 [Addendum No. 3, Vol. 1, at 21-24]. After a hearing on petitioner's state post-conviction petition, the state post-conviction court dismissed the petition on July 28, 2010 [Addendum No. 3, Vol. 1, at 33-35]. On October 11, 2011, the appellate court affirmed the state post-conviction court's denial of relief. *Troglin v. State,* E2010-01838-CCA-R3-PC, 2011 WL 4790943 (Tenn. Crim. App. 2011), *perm. app. denied* (Tenn. 2012). Petitioner's application for permission to appeal was denied by the Tennessee Supreme Court on February 15, 2012. Petitioner subsequently filed this timely federal § 2254 habeas petition.

## IV.    FACTUAL BACKGROUND

In its September 14, 2006, decision affirming the judgment, the Court of Criminal Appeals of Tennessee detailed the testimony and evidence from Petitioner's trial. *State v. Troglin,* 2006 WL 2633107, at *1-9. In addition, in its October 11, 2011 decision affirming the denial of his post-conviction petition, the appellate court summarized the testimony and evidence from Petitioner's post-conviction hearing. *Troglin v. State*, 2011 WL 4790943, at *9-14 (Tenn. Crim. App. 2011). A presumption of correctness attaches to state court determinations of factual issues. 28 U.S.C. § 2254(e)(1). Petitioner has not disputed the state court's factual findings.

The facts of the crime are quite substantial and will be taken from the appellate court's opinion on direct review. The facts presented in the state post conviction hearing will be taken from the appellate court's opinion affirming the denial of petitioner's state post-conviction petition.

### A.    Facts from Criminal Trial

The Court will summarize the pertinent facts from the appellate court's opinion affirming the

6

attempted murder conviction and sentence. This case arises from the attempted murder of Mr. Stafford. The State and Petitioner stipulated that prior to the shooting of Mr. Stafford on May 3, 1999, Petitioner was indicted for the homicide of Ralph Wilkey on July 27, 1998, by the Bledsoe County Grand Jury. On March 16, 1999, that case was scheduled to be tried on September 21, 1999. The victim in the instant case, Mr. Stafford, testified at that trial against Petitioner.

The attorney who represented Petitioner in the Ralph Wilkey murder trial testified he provided Petitioner with a copy of the State's witness list in that case at the end of April 1999. Mr. Stafford's name was on that list. Joe Johnson, who was acquainted with both Petitioner and Mr. Stafford, testified Petitioner told him the Thursday before Mr. Stafford was shot, that Mr. Stafford was on his list.

The State's witnesses testified Mr. Stafford arrived at the residence of Dennis R. Cagle ("Mr. Cagle") and his girlfriend, Victoria Dodson ("Ms. Dodson") on May 2, 1999, between 9:30 and 10:00 p.m., and asked Mr. Cagle to drive him to get something to eat. Petitioner had been drinking, so Mr. Cagle agreed to drive Petitioner into town which was a thirty to thirty-five minute drive. They drove to McDonald's and then decided to get beer at Nyla's Place, a gas station and convenience store. Petitioner had Mr. Cagle drive to Mr. Stafford's house, and Petitioner went to the door. Mr. Stafford and his wife were at home, and Mr. Stafford left with Petitioner and Mr. Cagle. The threesome drove to Nyla's Place, where Mr. Stafford entered the establishment at approximately 11:40 p.m. on May 2, 1999, and purchased a twelve-pack of beer and two packs of cigarettes.

Thereafter, driving in the vicinity of Mr. Stafford's residence, the men talked and drank a beer until they stopped at the Veteran's Club ("VFW") because Petitioner needed to use the rest room. Petitioner went to the back of the building and called Mr. Stafford back and told Mr. Cagle to stay

at the truck. Soon thereafter, Mr. Cagle heard two shots, saw Mr. Stafford running towards his house, and then he and Petitioner entered his truck and drove to his residence. When Mr. Cagle asked Petitioner what happened, he replied he "shook him up a little" but denied shooting him. *State v. Troglin,* 2006 WL 2633107, at 3. Mr. Stafford, however, testified Petitioner shot him immediately after asking, "you think they'll do anything to me about Ralph?" *Id.* at 6. The employees at Nyla's Place heard, on a police scanner, that Mr. Stafford had been shot about twenty minutes after he left that establishment. The police received a call about the shooting "a few minutes after 12:00" midnight, on May 3, 1999 [Addendum No. 1, Vol. 9, at 391].

The defense presented two witnesses who testified they had seen Mr. Cagle fire a pistol, possibly a forty-five, two or three times over the top of Jeremy Davis' truck on the day the victim was shot. Petitioner testified he and Mr. Cagle drove to Dunlap to buy hamburgers and beer. According to Petitioner, McDonald's was closed so they went to the Golden Gallon and bought beer. They returned to Mr. Cagle's house, at which time Mr. Cagle went into another room before returning to the living room and telling Petitioner he would be right back. Petitioner remained at the house with Ms. Dodson. Approximately an hour and a half later Mr. Cagle returned home and took a shower. While Mr. Cagle was in the shower, law enforcement arrived and requested that he accompany them to the station for questioning. Mr. Cagle subsequently left with law enforcement. Thereafter, law enforcement returned to Mr. Cagle's residence and took Petitioner into custody. *State v. Troglin,* 2006 WL 2633107, at *1-9.

## B. Facts from Post-Conviction Hearing

To put the issues before the Court into context, the state post-conviction appellate court findings, which are quoted as they appear in the state appellate court's opinion, are set forth below:

The post-conviction court conducted an evidentiary hearing, at which the petitioner's trial counsel testified that he represented the petitioner in his attempted first degree murder case. At that time, the petitioner had recently been convicted in another homicide case. Even so, counsel said that it never crossed his mind that there was not much he could do since the petitioner was going to be serving a long sentence regardless of the outcome in the present case.

Counsel testified that at the time of his representation, he had conducted "[o]ver a hundred" trials and was very familiar with the need to thoroughly investigate a case and call witnesses. Counsel said that he met with the petitioner two or three times in preparation for trial. During their meetings, counsel and the petitioner discussed the facts of the case, range of punishment, and the possible testimony of, and the petitioner's opinions concerning, the potential witnesses, including Teresa Smith, Richie Dykes, Victoria Dodson, and Denny Cagle. According to counsel, the petitioner "did not mince words" when talking about the witnesses. In particular, the petitioner said that Denny Cagle had killed two people in the past and that Dodson took medication for mental health issues.

Counsel testified that the petitioner expressed his desire for a continuance at least twice and initially wanted a change of venue as well. However, the petitioner later changed his mind and wanted to be tried in Bledsoe County. The petitioner also expressed his desire for counsel to withdraw from the case. Counsel stated that he and the petitioner discussed the need for a mental evaluation, and the petitioner agreed to get one.

Counsel testified that they discussed the petitioner's first trial and talked about how the petitioner thought the victim was a violent person. The petitioner asserted to counsel that he had "been had" in his first trial because the judge "rushed the jury for the 4th of July." The petitioner told counsel that Richard Wooden was the most damaging witness in the first trial and "if he was going to shot somebody, he'd have shot [Wooden]."

Counsel explained to the petitioner his right to testify and possible impeachment, and the petitioner decided that he did not want to testify. Counsel stated that he discussed trial preparations with the petitioner and noted that he had hired an investigator. They discussed self-defense and accident as possible defenses, but the petitioner claimed an alibi defense. The petitioner's alibi was that he stayed at Denny Cagle and Victoria Dodson's house while Cagle left; however, "there was no one else that could back that up." Counsel could not recall whether he interviewed Dodson before trial but said that he usually tried to interview every witness he could find.

Counsel said that he interviewed Denny Cagle and Elizabeth Summers, and he read the petitioner memos from those interviews. Counsel testified that the victim initially refused to talk to him, but counsel was able to successfully interview him within a

9

week of the trial. Counsel said that he conducted a phone interview of Teresa Smith and called for Richie Dykes but was unable to speak to him.

Asked if he cross-examined Victoria Dodson about whether the petitioner remained at her house while Cagle left for a time, counsel said that nine years had elapsed and he could not remember. However, he asserted that the record would reflect the nature of his questioning and that his line of questioning would have depended on how Dodson testified on direct examination. He acknowledged that it would have been important to know Dodson's version of the facts prior to trial from either an interview or through the discovery from the State. Counsel said that he did not think that anyone who was not on the witness list was interviewed regarding there being "bad blood" between the victim and Cagle.

Counsel testified that there was an issue right before trial where a friend or relative of the petitioner indicated that one of the jurors was overheard saying, in front of other people, something along the lines of "just hanging [the petitioner] and getting on with it[.]" Counsel said that he brought the allegation to the court's attention but did not move for a mistrial because "without some proof that there had been tainting, it's not going to be granted."

Counsel testified that he received a list of the members of the jury pool prior to trial, but he did not recall whether he went through the list with the petitioner, and his notes were silent on the matter. He said that he "might very well have" made a notation in his notes had he gone over the list with the petitioner and had the petitioner indicated a problem with any of the potential jurors. Counsel acknowledged that "[i]t can be" a usual trial preparation to discuss the jury pool with one's client. However, counsel, not being from Bledsoe County, met with a local attorney, who went through the list of potential jurors with him. He and the local attorney discussed the potential jurors' backgrounds and any problems they may have had. Counsel filed a motion for individual sequestered voir dire so he could question the potential jurors individually in the jury room.

Counsel testified that the petitioner was not tried in prison clothes because he remembered the trial being delayed due to the petitioner's being brought from the jail in his prison clothes and having to wait for the petitioner's family to bring his civilian clothes. Counsel said that he did not request a charge of voluntary intoxication because the petitioner had been insistent that he was not present during the crime and he "could [not] play it both ways with the jury." Counsel could not recall whether he mentioned the alibi defense in his opening statement but said that, if he did not, it was a strategy "in case any of the state witnesses backed up on their stories."

Counsel testified that if he did not cross-examine Cagle, Dodson, and the victim regarding the petitioner's alibi defense, it was because they all testified that the petitioner was present at the scene of the crime and counsel had to focus on attacking

10

their credibility. Specifically, counsel asked Dodson about her use of Xanax and alcohol; he "went more on attacking their perceptions."

Counsel testified that the petitioner thought that all of the witnesses were "liars" and if counsel had "known how to prove that they were lying [he] would have done it." Counsel noted that he did a criminal history check of the victim. Counsel recalled that there were questions concerning Cagle's involvement in the shooting, but he did not interview people in the community regarding why Cagle would have been involved in a shooting of the victim.

Counsel testified that he withdrew as the petitioner's attorney prior to the hearing on the motion for new trial. He acknowledged that he and the petitioner had issues with each other and "exchanged words a lot of times." Counsel noted that the day he arrived to argue the motion for new trial, he discovered that the petitioner had filed a civil suit against him for monetary damages, which bothered counsel because he had worked very hard on the petitioner's case. Counsel said that the petitioner was "the most difficult client" he had ever represented, and the petitioner had a bad inmate advisor. Counsel recalled that he would send informative letters to the petitioner throughout the process, and every letter "would be turned around ... [and] used against [him]." The petitioner wrote to the Board of Professional Responsibility with complaints against counsel.

Counsel testified that, as a result of his difficulties with the petitioner, he attempted to withdraw, pretrial, on a couple of occasions. After he successfully withdrew following the trial, counsel and appellate counsel had some communications with one another at the courthouse but did not have a sit-down interview. Counsel did not testify at the motion for new trial hearing. Counsel sent the case file to the petitioner and "probably" told appellate counsel that the file was the property of the petitioner and he could refer to it as necessary.

On cross-examination, counsel testified that another attorney, "first counsel," represented the petitioner in the petitioner's other case that resulted in a second degree murder conviction. The petitioner also asserted an alibi defense in that case. Counsel said that, in the present case, he knew from reviewing the Jencks material and his interviews that the witnesses were going to completely contradict the petitioner's alibi defense. Further, the only witnesses the petitioner provided were ones who would say that Denny Cagle owned a .45 caliber gun and had shot it recently. However, the .45 caliber gun presumably belonging to Cagle was tested by the TBI and determined not to be the murder weapon.

Counsel testified that the petitioner was not always forthcoming with counsel, and counsel would "ha[ve] to keep trying to drag stuff out of him." Counsel said that the petitioner was present during voir dire and consulted during the process. In particular, counsel's notes reflected that the petitioner wanted a certain potential juror on the jury

but then later claimed that "we should not have kept [the juror] on there[.]" Regarding his not mentioning the alibi defense in his opening statement, counsel agreed that divulging things to the State in opening statement could hamper the trial. Counsel said that the petitioner "waffled" on whether he wanted to testify, which was also a reason to not address in opening statement what the petitioner would or would not say. Counsel stated that he was not surprised by anything said by the witnesses, and he did not know of anything he could have done differently that would have affected the outcome of the case. Moreover, counsel did not think that any further consultation or conversations with the petitioner would have been helpful because "nothing new came out any time that [they] spoke ... after the first time."

Appellate counsel testified that he represented the petitioner at the motion for new trial hearing and on appeal. Prior to conducting the motion for new trial hearing, appellate counsel met with trial counsel "a time or two" at the courthouse and retrieved the file from him. Appellate counsel was aware that the petitioner had filed a complaint against trial counsel with the Board of Professional Responsibility. One of the grounds alleged for relief was the acrimonious relationship between the petitioner and trial counsel. Appellate counsel recalled that it was the petitioner and his inmate advisor's idea to include ineffective assistance of counsel as a ground for relief in the motion for new trial, and appellate counsel was against it. The petitioner was strongly advised not to pursue ineffective assistance of counsel in his motion for new trial or on direct appeal. However, at the petitioner's insistence, appellate counsel "put on what proof was suggested," framing the issue around the "bad relationship" between the petitioner and trial counsel. Appellate counsel did not call trial counsel as a witness at the motion for new trial hearing because trial counsel never indicated that the poor relationship prevented him from being effective. Appellate counsel felt that to have trial counsel testify would be counter-productive, so he "figured that was our best advantage ... to frame it from [the petitioner]'s standpoint and leave [trial counsel] off the stand saying, ['oh, I still did my best and I didn't have any problem.[']"

Appellate counsel testified that he received no indication from the petitioner that he wanted a witness called to testify that was not called. Appellate counsel acknowledged that the petitioner's inmate advisor sent him a letter asking that he subpoena trial counsel to testify at the motion for new trial hearing. However, he explained that the letter was written close to a year before the motion for new trial was filed, and he tried to convince, and hoped, during the interim "that they would give up on this idea of pursuing ineffective assistance of counsel [on] direct appeal."

Appellate counsel testified that he was concerned that if they only raised one ground of ineffective assistance of counsel, the other grounds would be waived. Counsel said that "all [he] knew to do was try to explain it as thoroughly and as clearly as [he] could to [his] client, if [the petitioner] rejected [his] theory, then [he] put in there what [the petitioner] requested[.]" Even though appellate counsel raised ineffective

12

assistance of counsel on direct appeal, he did not include it as a ground in his application for permission to appeal to the Tennessee Supreme Court because he "didn't think it was a good issue to take up to the supreme court" as he did not think it was a good issue to have been raised in the first place. Appellate counsel stated that, even though he did not think ineffective assistance of counsel was a strong claim to raise on direct appeal, that did not negatively impact the effort he put into proving the claim because it tied in with the animosity between the petitioner and trial counsel and how the court erred in not granting trial counsel's motion to withdraw.

The petitioner testified that trial counsel met with him two times prior to trial, and the visits were not very long. The petitioner did not believe that counsel was interested in his case at all. The petitioner said that he explained to counsel that the victim and Denny Cagle "had been into it for a number of years over drugs," but he did not know whether counsel ever investigated that relationship or any of the other witnesses. The petitioner stated that he and counsel had a bad relationship because counsel "just didn't do his job," and counsel had represented the victim and one of the witnesses in other matters. Asked what counsel should have done differently, the petitioner said that counsel "should have come off [his] case," should have met with and communicated with him more often, and should have talked to him before the motion for new trial.

The petitioner testified that he and trial counsel never sat down prior to trial and discussed the list of potential jurors and, had they gone over the list, the petitioner would have been able to provide information that would have avoided the juror problems that occurred in the trial. The petitioner stated that he tried to talk to counsel about who he wanted counsel to interview and how he wanted to be defended, but counsel "didn't listen to [him]" and "didn't represent [him] the way it ought to be represented in court ." The petitioner said that he did not "trust [trial counsel] in no way."

With regard to appellate counsel's representation, the petitioner testified that he did not tell appellate counsel, or have his inmate advisor tell appellate counsel, to raise the issue of ineffective assistance of counsel on direct appeal. The petitioner said that he cannot read and write so he depends on what his inmate advisor communicates for him. The petitioner said that he never had a conversation with appellate counsel regarding raising the issue of ineffective assistance of counsel on direct appeal, but then later said that he actually told appellate counsel that ineffective assistance of counsel was an issue that should not be pursued on a direct appeal.

On cross-examination, the petitioner admitted that the two witnesses he claimed he wanted trial counsel to talk to were Dennis Cagle and Victoria Dodson, both of whom were either interviewed or procured a statement from prior to trial. He did not know of any other witness names he gave trial counsel to interview. With regard to the selection of the jury, the petitioner acknowledged that he was sitting beside counsel

13

throughout the process but said that counsel did not ask his opinion on every juror. The petitioner said that he did not tell trial counsel that he specifically wanted to keep the one particular juror with whom he later alleged a conflict. He stated that he was drunk the night of the offense and that was why he wanted counsel to get a voluntary intoxication charge even though he maintained that he was not present during the offense. With regard to appellate counsel's testimony regarding raising the issue of ineffective assistance of counsel, the petitioner said that appellate counsel lied in his testimony. He also said that appellate counsel "misrepresented [him] in court by not calling [his] witnesses ... on the motion for new trial."

In denying the petition, after reviewing the standard of review, the post-conviction court found that neither attorney performed in such a way to "breach the standard of care, but even if there were something that breached the standard of care, ... [none] of these alleged errors were such that ... the verdict in the trial would have been otherwise." The court further commented that the petitioner's "credibility is suspect" and explicitly resolved any conflicts in the testimony in favor of trial counsel and appellate counsel.

*Troglin v. State*, 2011 WL 4790943, at * 9-14.

## V.      ANALYSIS

Petitioner's pleadings are confusingly pled and his claims are difficult to decipher.  After thoroughly reviewing Petitioner's pleadings, the Court generally discerns the same claims as Respondent's counsel discerned from the pleadings.  Petitioner asserts the following grounds for relief: (1) ineffective assistance of trial counsel based on counsel's alleged failure to adequately and properly prepare for trial and adequately present an alibi defense; (2) ineffective assistance of appellate counsel based on counsel's alleged deficient performance during the motion for new trial when he failed to call trial counsel as a witness, speak to Petitioner about his strategy for the hearing, and raise all of Petitioner's ineffective assistance of counsel claims; and (3) denial of a fair trial and due process when the trial court failed to: (a) strike prospective, prejudicial jurors, resulting in a biased jury, and (b) instruct the jury on the lesser included offense of aggravated assault.  The Court will address the claims in the sequence in which Petitioner raised them.

14

### A.    Ineffective Assistance of Counsel

Petitioner claims both his trial and appellate counsel were constitutionally ineffective.  The Court first will address the law applicable to ineffective assistance of counsel claims, before analyzing each alleged instance of ineffective assistance.

In order to demonstrate ineffective assistance of counsel, a petitioner must show not only his attorney's representation fell below the standard of competence demanded of attorneys in criminal cases but also a reasonable probability that, but for the attorney's unprofessional errors, the result of the proceeding would have been different.  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *McMann v. Richardson*, 397 U.S. 759, 771 (1970).  The *Strickland* test requires a defendant to demonstrate two essential elements:  (1) counsel's performance was deficient, i.e., counsel was not functioning as counsel guaranteed the defendant by the Sixth Amendment, and (2) counsel's deficient performance prejudiced the defense, i.e., deprived the defendant of a fair trial rendering the outcome of the trial unreliable, i*d*. at 687-88, and in terms of appellate counsel, rendering the outcome of the direct appeal unreliable.  *See Ivory v. Jackson,* 509 F.3d 284, 294 (6th Cir. 2007) (to demonstrate ineffective assistance of appellate counsel must show reasonable probability the result of the appeal would have been different).

As the United States Court of Appeals for the Sixth Circuit explained in *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992), *cert. denied*, 508 U.S. 975 (1993): "Counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise would probably have won."  *See also West v. Seabold*, 73 F.3d 81, 84 (6th Cir.), *cert. denied*, 518 U.S. 1027 (1996).  "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the

Case 1:12-cv-00111-CLC-WBC   Document 15   Filed 04/02/14   Page 15 of 50   PageID #: 172

[ultimate] judgment." *Id.* (quoting *Strickland*, 466 U.S. at 691) (citing *Smith v. Jago*, 888 F.2d 399, 404-05 (6th Cir. 1989), *cert. denied*, 495 U.S. 961 (1990)). There is a strong presumption counsel's conduct was within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

The Court cannot indulge in hindsight, but must instead evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors. *Strickland*, 466 U.S. at 690. Trial counsel's tactical decisions are particularly difficult to attack. *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). A defendant's challenge to such decisions must overcome a presumption that the challenged actions might be considered sound trial strategy. *O'Hara*, 24 F.3d at 828. Effective assistance of counsel is presumed, and the Court will not generally question matters involving trial strategy. *See United States v. Chambers,* 944 F.2d 1253, 1272 (6th Cir. 1991), *cert. denied*, 502 U.S. 1112 (1992), *superseded in part on other grounds*, by USSG § 2D1.5(a).

Therefore, to prove deficient performance, a petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness under the then "prevailing norms of practice." *Strickland,* 466 U.S. at 688. When evaluating counsel's performance, the Court is mindful of the *Strickland* Court's instructions that "[t]here are countless ways to provide effective assistance of counsel. Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.* In addition, the American Bar Association ("ABA") Standards for Criminal Justice are "guides to determining what is reasonable." *Rompilla v. Beard,* 545 U.S. 374, 387 (2005); *Wiggins v. Smith,* 539 U.S. 510, 524 (2003); *Strickland,* 466 U.S. at 688.

"[R]eviewing court[s] must remember that 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional

16

judgment.'" *Wong v. Money*, 142 F.3d 313, 319 (6th Cir. 1998), (quoting *Strickland v. Washington*, 466 U.S. at 690). The Court must make an independent judicial evaluation of counsel's performance, and determine whether counsel acted reasonably under all the circumstances. *O'Hara*, 24 F.3d at 828; *Ward v. United States*, 995 F.2d 1317, 1321-22 (6th Cir. 1993).

"Reviewing courts focus on whether counsel's errors have undermined the reliability of and confidence that the trial was fair and just." *Austin v. Bell*, 126 F.3d 843, 847 (6th Cir. 1997) *cert. denied*, 523 U.S. 1079 (1998) (citing, *Strickland*, 466 U.S. at 687; *United States v. Cronic*, 466 U.S. 648, 658, (1984)). To establish the prejudice prong, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694.

### 1. *Ineffective Assistance of Trial Counsel*

Petitioner contends trial counsel was ineffective for failing "to adequately meet with petitioner to adequately prepare the case for trial" (Court File No.1). Specifically, Petitioner complains that trial counsel only met with him twice prior to trial, refused to listen to him, failed to review the list of potential jurors with him prior to trial, failed to interview his alleged "key alibi witness" (Dodson) prior to trial, and failed to mention Petitioner's alibi in opening statement (Court File No. 1).

Aside from the fact Petitioner has failed to present any evidence that these alleged shortcomings resulted in any prejudice, it is questionable whether these ineffective assistance of trial counsel claims are properly before the Court. This is so, because Petitioner raised an entirely different ineffective assistance of counsel claim on direct appeal. Although Petitioner raised these claims during his state post-conviction proceedings, the appellate court first concluded the claim of

ineffective assistance of counsel was previously determined on direct appeal and could not be relitigated in his post-conviction proceeding even though he did not raise the same claims on direct appeal, and second, concluded counsel was not ineffective. *Troglin v. State*, 2011 WL 4790943, at *16 (Tenn. Crim. App. 2011). The state appellate post-conviction court explained its rejection of Petitioner's ineffective assistance of trial counsel claims as follows:

> The petitioner argues that trial counsel rendered ineffective assistance by failing to "adequately meet with [him] to adequately prepare the case for trial" and not listening to him at their meetings. He asserts that, had counsel met with him more often and "actually listened to him," trial counsel would have reviewed the list of potential jurors and also learned background information on the State's witnesses that could be used for impeachment. The petitioner also asserts that trial counsel was ineffective for failing to interview Victoria Dodson prior to trial and for not "effectively pursu[ing] the defense strategy of [the petitioner]'s alibi."

> The Post–Conviction Procedure Act provides in pertinent part:

> (f) Upon receipt of a petition in proper form, or upon receipt of an amended petition, the court shall examine the allegations of fact in the petition. If the facts alleged, taken as true, fail to show that the petitioner is entitled to relief or fail to show that the claims for relief have not been waived or previously determined, the petition shall be dismissed. The order of dismissal shall set forth the court's conclusions of law.
> ....

> (h) A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence.

> Tenn. Code Ann. § 40–30–106(f), (h) (2006).

> We initially note that the petitioner's claim of ineffective assistance of trial counsel was previously determined by this court on direct appeal and cannot be relitigated in a post-conviction proceeding, even though the petitioner may not have made the same allegations on direct appeal that he now makes in his post-conviction petition. *See Ronald Yates v. State*, No. W2008–02067–CCA–R3–PC, 2009 WL 4505436, at *3 (Tenn. Crim. App. Dec.3, 2009); *Jay Homer Chambers v. State*, No. E2004–01862–CCA–R3–PC, 2005 WL 2346974, at *2 (Tenn. Crim. App. Sept.26, 2005); *John Earl Scales v. State*, No. M2003–01753–CCA–R3–PC, 2004 WL

18

1562542, at *6–7 (Tenn. Crim. App. July 13, 2004), *perm. to appeal denied* (Tenn. Nov. 8, 2004); *Russell Lane Overby v. State*, No. W2001–01247–CCA–R3–PC, 2002 WL 818250, at *2 (Tenn. Crim. App. Apr.26, 2002), *perm. to appeal denied* (Tenn. Sept. 9, 2002). This court has previously noted that raising a claim of ineffective assistance of counsel on direct appeal is "fraught with peril." *Thompson v. State*, 958 S.W.2d 156, 161 (Tenn. Crim. App.1997). Ineffective assistance of counsel is "a single ground for relief" under the post-conviction statute, even though the violation may be established by multiple acts or omissions. *Id.* (citations omitted).

In any event, trial counsel testified to his preparations for the petitioner's case, including his interactions with the petitioner, interviewing the witnesses, and his utilization of the petitioner's requested alibi defense. The post-conviction court accredited the testimony of counsel over that of the petitioner's "suspect" testimony. From our review, we fail to see any deficiency in counsel's performance or, moreover, how any alleged deficiency would have changed the outcome of the case.

*Troglin v. State,* 2011 WL 4790943, at *15-16 (Tenn. Crim. App. 2011).

In his answer, Respondent argues the state appellate court properly cited and applied the *Strickland* standard of ineffective assistance of counsel and its decision was not contrary to, or an unreasonable application of, clearly established law as decided by the United States Supreme Court, nor did it involve an unreasonable determination of the facts in light of the evidence (Court File No. 4, at. 21).

Arguably, the state post-conviction court's procedural ruling that the ineffective assistance of counsel claim was previously determined, and therefore, could not be relitigated forecloses federal habeas review. "To be adequate, a state procedural rule must be firmly established and regularly followed. . . ." *Hutchison v. Bell,* 303 F.3d 720, 737 (6th Cir. 2002) (internal punctuation omitted). The Court's research, however, did not reveal a Sixth Circuit case recognizing the Tennessee previously determined statute, Tenn. Code Ann. § 40-30-106(h), as an independent and adequate state rule that is regularly enforced when a defendant raises an ineffective assistance of counsel claim on direct appeal and subsequently raises different ineffective assistance of counsel claims during

19

post-conviction. Nevertheless, as explained below, aside from any procedural default, Petitioner is not entitled to relief as his ineffective assistance of counsel claims lack merit.

Petitioner must demonstrate the state court decision finding there was no ineffective assistance of counsel is contrary to or an unreasonable application of federal law. The Supreme Court has explained that "[a] state court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases[,] . . .[or] if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent" *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Neither the Court's research nor Petitioner's pleadings demonstrate the state court decision was contrary to Supreme Court precedent.

To demonstrate the state court unreasonably applied federal law, Petitioner must demonstrate the state court decision identified the correct governing legal rule from Supreme Court precedent but unreasonably applied it to the facts of Petitioner's case or that the state court unreasonably extended a legal principle from the Supreme Court's precedent to a new context where it should not apply or unreasonably refused to extend that principle to a new context where it should apply. *Id.* at 407-08. After correctly noting *Strickland* is the controlling precedent applicable to an ineffective assistance of counsel claims, the Tennessee Court of Criminal Appeals found Petitioner's ineffective assistance of trial counsel claims procedurally defaulted and alternatively, insufficient to meet the *Strickland* standard.

Applying the applicable standards, the Court will now consider Petitioner's individual claims that trial counsel failed to meet with him often enough to properly prepare for trial, interview a witness prior to trial, and effectively pursue his alibi defense.

a.     <u>Failed to Adequately Prepare for Trial</u>

Petitioner faults counsel for not meeting with him more often, refusing to listen to him, and failing to review the list of potential jurors with him prior to trial.  According to Petitioner, these alleged shortcomings prevented counsel from adequately preparing for trial.  Petitioner has provided no facts to demonstrate these alleged shortcomings prevented counsel from properly preparing for trial.  Specifically, Petitioner has provided no evidence of what counsel would have learned had he met with Petitioner more often and listened to him, or what a review of the jury list prior to trial would have revealed.  Counsel's testimony, on the other hand, demonstrates these alleged omissions did not prevent him from adequately preparing for trial.

Counsel testified his notes reflected he met with Petitioner twice, about a month and a half before trial and about two weeks before trial.  Although counsel believed he met with Petitioner more than two times, his notes only reflected those two meetings.  Counsel testified during those meetings they discussed the general facts in terms of what happened that day, that night, leading up to the shooting; the range of punishment; the Petitioner's opinion of the witnesses and what they might say.  In addition, they discussed a change of venue, a continuance, Petitioner's other trial on the homicide charge, the victim, possible defense witnesses, his right to testify, and impeachment [Addendum No. 3, Vol. 2, at 46].

At the second meeting they prepared for trial.  Counsel read Petitioner the interview memos on Mr. Cagle and Elizabeth Summers, and they discussed some of the witnesses.  Because none of the witnesses supported Petitioner's alibi defense, trial counsel discussed self-defense and accident as defenses.  Petitioner, however, rejected self-defense and accident as defenses and claimed he wanted to proceed with his alibi defense.  At this meeting Petitioner stated he wanted to be tried in

21

Bledsoe County and they discussed whether to obtain a mental evaluation.  Petitioner also advised

counsel he wanted a continuance and for counsel to withdraw.  [Addendum No. 3, Vol. 2, at 46-51].

Counsel suggested alternative defenses to Petitioner based on counsel's investigation of the

case, the investigation performed by his investigator, and his review of the material given to him by

the State prior to trial, but Petitioner was adamant that he did not shoot the victim and was not present

at the crime scene.  Petitioner identified no witnesses, other than himself, that would contradict the

testimony of the State's witnesses who put him at the crime scene.  The only witnesses Petitioner

gave counsel were people who would testify Mr. Cagle had a .45 caliber weapon and shot it earlier

the day of the attempted murder.  Counsel testified no witness said anything that surprised him, he

knew what they were going to say, and after their first meeting, Petitioner did not provide him with

anything new to assist him in his defense [Addendum No. 3, Vol. 2, at 66, 87-92].

As to Petitioner's allegation counsel was ineffective for failing to review the list of

prospective jurors with him, counsel, who was from Sequatchie County, admitted he did not go over

the jury list with Petitioner prior to trial and agreed it would be important to consult a resident of

Bledsoe County about the potential jurors.  Counsel, however, further testified  he consulted a local

lawyer he knew about the prospective jurors.  Counsel had the jury list where he had marked red Xs

by prospective jurors he was advised not to keep and red check marks by those who local counsel

advised him to consider keeping on the jury.  In addition, counsel filed a motion for individual

sequestered *voir dire* [Addendum No. 3, Vol. 2, at 64-65].  Counsel further testified he consulted with

Petitioner during both the individual and general *voir dire* about who he wanted and who he did not

want on the jury.  Counsel's notes from jury selection reflected Petitioner did not want to strike

Ralph Angel from the jury because they had previous business dealings together.  Counsel recollected

Petitioner subsequently verbalized his regret of that decision [Addendum No. 3, Vol. 2, at 89]. Notably, Petitioner admitted counsel consulted with him about the jurors during jury selection. When asked whether counsel asked Petitioner whether he "wanted to keep this juror or not keep this juror," he responded, "[s]ome of them he did and some of them he didn't." [Addendum No. 3, Vol., 2, at 147-48].

Petitioner presented no evidence during his state post-conviction hearing demonstrating what counsel would have learned had he met with him more than twice or any evidence contradicting trial counsel's testimony. In addition, Petitioner has not overcome the trial court's finding that his "credibility is suspect" and that both the trial and appellate attorneys were credible [Addendum No. 3, Vol. 2, at 159-160]. Moreover, even if it were accepted that counsel's failure to meet with Petitioner more often, listen to Petitioner, and review the jury list with Petitioner prior to trial amounts to deficient performance, which the Court does not find, Petitioner has failed to demonstrate a reasonable likelihood that, if only there had been more meetings, better listening, and a pretrial review of the jury list with Petitioner, counsel would have been able to pursue some viable defense.

Accordingly, because Petitioner has not demonstrated a reasonable probability, that absent counsel's alleged omissions, the outcome of his trial would have been different, the Court's confidence in the outcome of the trial has not been undermined; thus, this claim of ineffective assistance of trial counsel is without merit and will be **DISMISSED**.

b.    Failure to Interview Ms. Dodson

Next Petitioner contends counsel was ineffective because he failed to meet with and interview Victoria Gossett Dodson ("Ms. Dodson"). Notably, Petitioner has not proven this allegation as he failed to call Ms. Dodson to testify during his state post-conviction proceedings that counsel failed

23

to interview her.  Although counsel's memory was not entirely clear, he testified he usually tried to interview every witness but could not recall whether he interviewed Ms. Dodson.  *See State v. Troglin,* 2006 WL 2633107, at *10.  Counsel also testified that based on his receipt of material from the state prior to trial and his own interview of witnesses, he was aware of the expected substance of Ms. Dodson's testimony.

Still, even assuming counsel failed to interview Ms. Dodson prior to trial and this alleged omission was deficient, Petitioner has not demonstrated a reasonable likelihood that, had counsel interviewed Ms. Dodson, the outcome of the trial would have been different.  Glaringly absent from Petitioner's claim is any testimony from Ms. Dodson supporting Petitioner's alleged alibi.  Petitioner's failure to present Ms. Dodson during his state post-conviction proceedings is fatal to this claim.

Accordingly, because Petitioner has failed to demonstrate a reasonable probability that but for trial counsel's alleged omission the outcome of his trial would have been different, he has failed to demonstrate he was denied his constitutional right to effective assistance of counsel, thus necessitating the **DISMISSAL** of this claim.

c.    Failure to Effectively Pursue the Alibi Defense

In his last ineffective assistance of trial counsel claim, Petitioner contends counsel failed to introduce his alibi defense during his opening statement and adequately present it at trial.  Petitioner's alibi was that after he and Mr. Cagle returned from their trip to town, Mr. Cagle left him and Ms. Dodson at the house for about an hour and a half, and subsequently left again with law enforcement.  However, there was no witness to back up this claim. *State v. Troglin,* 2006 WL 2633107, at *9.  Mr. Cagle and Ms. Dodson both testified the only time Petitioner was at their residence alone with Ms.

24

Dodson was while Mr. Cagle was being questioned by law enforcement. In addition, the victim of the shooting, who was well acquainted with Petitioner, testified unequivocally that he was with Petitioner and Mr. Cagle at the VFW, when Petitioner shot him. Petitioner has provided no evidence whatsoever, to dispute the testimony presented by the State's witnesses during his trial. Specifically, Petitioner failed to present any alibi proof during his state post-conviction hearing, other than his testimony that he was not present at the crime scene. Consequently, there is no evidence in the record of Petitioner's alibi defense other than his testimony.

Additionally, trial counsel could find no evidence or witness to support Petitioner's alibi defense. The only witnesses Petitioner directed counsel to interview were ones who could testify only that they had seen Mr. Cagle shoot a .45 caliber weapon earlier that day and those two witnesses testified on Petitioner's behalf during trial [Addendum No. 3, Vol. 2, at 43-95–trial counsel's testimony]. Petitioner did not present a single witness, during his state post-conviction proceeding, to support his alleged alibi defense that he was at the residence with Ms. Dodson when the victim was shot or any evidence demonstrating trial counsel failed to adequately investigate his alibi defense.

Trial counsel's failure to mention Petitioner's alibi defense was a strategic decision. Trial counsel explained that he did not address Petitioner's alibi defense in his opening statement because he did not want to lock himself in too tightly during his opening statement. This decision by counsel was strategic and Petitioner has failed to present any evidence demonstrating it was unreasonable. Moreover, considering there was no proof whatsoever of Petitioner's alibi defense other than his own testimony, this strategic decision was not unreasonable [Addendum No. 3, Vol. 2, at 69].

In sum, the record shows there was one witness to support Petitioner's alibi defense. That

witness was Petitioner, and he testified at his trial. Petitioner did not present his alleged alibi testimony or impeach the testimony of any State witness during his state post-conviction hearing. Thus, there is nothing in the record from which the Court may even infer there is a witness that would support Petitioner's alibi defense. Indeed, trial counsel presented all the evidence he had to support Petitioner's alibi. Consequently, Petitioner has not demonstrated any prejudice as a result of counsel's alleged omissions, and this claim of ineffective assistance of counsel warrants no habeas relief.

Accordingly, after throughly reviewing the record in the case, including the entire trial, motion for new trial, and post-conviction transcripts, the Court concludes habeas relief will be **DENIED** on this claim as Petitioner was not denied the effective assistance of trial counsel and the decision of the state appellate court is not contrary to, or an unreasonable application of *Strickland,* or an unreasonable determination of the facts.

### 2. *Appellate Counsel*

Petitioner contends appellate counsel ineffectively represented him during his motion for new trial hearing and on direct appeal. As he did in state post-conviction proceedings, Petitioner specifically contends appellate counsel was ineffective for failing to call trial counsel as a witness to testify regarding the deterioration of their relationship and failing to raise all issues of ineffective assistance of counsel on direct appeal. Therefore, these claims are ripe for habeas review.[2]

---

[2] To the extent Petitioner claims appellate counsel ineffectively failed to communicate with him and called him as a witness to testify during his motion for new trial proceeding, these claims are not subject to habeas review. Petitioner did not raise these claims in his state post-conviction appeal. Claims not raised for state court appellate review are not reviewable in this federal habeas proceeding. Accordingly, these claims are barred by procedural default because they were not raised in the post-conviction appellate court. *O'Sullivan v. Boerckel,* 526 U.S. 838, 845 (1999) ("[W]e conclude that state prisoners must give the state courts one full opportunity to resolve

The state appellate post-conviction court, after properly citing to *Strickland* and its two prong test, resolved Petitioner's claim that appellate counsel was ineffective for failing to call trial counsel as a witness at the motion for new trial hearing and for raising only one limited ineffective assistance of counsel claim on direct appeal as follows:

> The petitioner argues that appellate counsel rendered ineffective assistance for failing to call trial counsel as a witness at the motion for new trial hearing. In addition, he asserts that, if this court finds that his various allegations of ineffective assistance of trial counsel are waived due to appellate counsel's raising ineffective assistance on direct appeal, then appellate counsel was also ineffective for raising one allegation of ineffective assistance without raising the other possible allegations of ineffective assistance.
>
> With regard to appellate counsel's failure to call trial counsel as a witness at the motion for new trial hearing, appellate counsel testified that he strategically decided to not call trial counsel as a witness at the motion for new trial hearing because trial counsel never indicated that his poor relationship with the petitioner prevented him from being effective, and appellate counsel felt that to have trial counsel testify would be counter-productive. Appellate counsel explained that he thought it would be to the petitioner's advantage to present the issue solely from the petitioner's viewpoint. Based on our review, we cannot conclude that this strategic decision on the part of appellate counsel constituted deficient performance, nor do we see how the outcome would have been different if trial counsel had testified to the apparent poor relationship between him and the petitioner.
>
> As to the petitioner's allegation that appellate counsel was ineffective in raising the issue of ineffective assistance of counsel, appellate counsel testified that he was afraid that the petitioner would waive all grounds of ineffective assistance of counsel by raising one ground on direct appeal, and both appellate counsel and the district public defender strongly advised the petitioner to not pursue the issue. However, the petitioner insisted, so counsel raised the issue as framed by the petitioner. As explained by appellate counsel: "My concern was you raise one issue, you've raised them all. But all I knew to do was try to explain it as thoroughly and as clearly as I could to my client, if he rejected my theory, then I put in there what he requested I put in there." Again, the post-conviction court accredited appellate counsel's testimony. Therefore, we discern no deficiency on the part of counsel. Moreover, as indicated above, even if the petitioner's other allegations of ineffective assistance of trial

any constitutional issues by invoking one complete round of the State's established appellate review process").

27

counsel were not deemed previously determined, we conclude that he would not be
entitled to relief. Thus, there was also no prejudice caused by appellate counsel's
actions.

*Troglin v. State,* 2011 WL 4790943, at *16-17.

Appellate counsel explained he did not have trial counsel testify during the motion for new
trial because, after speaking with trial counsel, he concluded trial counsel's testimony, indicating that
his poor relationship with Petitioner did not prevent him from being effective, would be counter-
productive. Thus, it appears appellate counsel's decision was based on reasonable trial strategy. In
light of all the circumstances, the Court is unable to conclude that counsel's alleged omission was
outside the wide range of professionally competent assistance. *Strickland,* 466 U.S. at 690
("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options
are virtually unchallengeable . . . "). Even assuming for the sake of discussion that appellate
counsel's omission equates to deficient performance, Petitioner presented no evidence from trial
counsel during his state post-conviction hearing from which the Court may infer prejudice from
appellate counsel's failure to call trial counsel during the hearing on his motion for new trial.

Accordingly, the state appellate court's decision concluding appellate counsel's strategic
decision did not constitute deficient performance and finding no reasonable probability that the
outcome would have been different had trial counsel testified to the apparent poor relationship
between him and Petitioner, was not contrary to, or an unreasonable application of *Strickland*, nor
did it involve an unreasonable determination of the facts in light of the evidence.

Likewise, appellate counsel's failure to raise all claims of ineffective assistance of counsel
on direct appeal did not result in constitutionally ineffective assistance of appellate counsel. First,
the evidence indicates that, contrary to trial and appellate counsel's advice, ineffective assistance of

28

counsel was raised on direct appeal because Petitioner and his inmate advisor demanded it to be raised [Addendum No. 3, Vol. 3, Exhibit 6–letter from trial counsel's boss telling Petitioner his demand to allege ineffective assistance of counsel in the motion for new trial would not be honored and suggesting a case to that effect that his advisor should read; Exhibit 4–Correspondence from Petitioner's inmate advisor sending appellate counsel the motion for new trial he had drafted and added "the issues of ineffective assistance of counsel"]. Indeed, appellate counsel subsequently sent a letter to Petitioner verifying he had advised Petitioner not to raise an ineffective assistance of counsel claim, but the claim was being raised at Petitioner's insistence [Addendum No. 3, Vol. 3, Exhibit 5–Counsel's letter to Petitioner).

Nevertheless, even assuming for sake of discussion that appellate counsel ineffectively failed to raise all alleged claims of ineffective assistance of trial counsel, Petitioner has failed to establish prejudice. This is so, because, as explained above, Petitioner has presented no viable ineffective assistance of counsel claim. Consequently, Petitioner has not met his burden of proving the decision of the Tennessee Criminal Court of Appeals was an unreasonable application of *Strickland*, or was based on an unreasonable determination of the facts.

Accordingly, Petitioner's claim that he was denied the effective assistance of appellate counsel based on appellate counsel's failure to call trial counsel as a witness at the hearing on the motion for new trial and raise all ineffective assistance of counsel claims in the new trial motion and on direct appeal will be **DISMISSED** as lacking any merit.

### B.     Trial Court Errors

Petitioner claims the trial court denied him a fair trial and due process when it failed to strike Jurors Larry Hankins ("Juror Hankins"), Ronald Nipper ("Juror Nipper"), and Ralph Angel ("Juror

Angel"). In addition, Petitioner claims the trial court erred in failing to instruct the jury on aggravated assault–a crime he labels as a lesser included offense of attempted first degree murder, but acknowledges Tennessee does not recognize it as such. The Court will address the juror claims before analyzing the jury instruction claim.

### 1. *Juror Claims*

Petitioner claims the trial court erred when it failed to strike Juror Hankins for cause based on his relationship to the victim and his alleged improper comments to other jury members, and Juror Nipper for cause, based on his relationship as second cousin to the State's key witness, Mr. Cagle. In addition, Petitioner contends the trial court erred when it denied his motion for new trial on the ground that Juror Angel, who served as foreman, failed to acknowledge, during *voir dire*, he knew Petitioner and was aware of his murder conviction.

The juror claims are very fact specific and the state court's credibility findings are presumed correct but may be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). At the outset, the Court observes the appellate court's decision was based substantially on state law and state cases, as that is what Petitioner relied upon in his state appellate brief. However, Petitioner did mention the "Sixth Amendment of the United States Constitution guarantee[s] an accused in a criminal prosecution the right to a trial by an impartial jury." [Addendum No. 2, Doc. 1, at 13], and the state appellate court cited to *Patton v. Yount,* 467 U.S. 1025 (1984) (concluding the question of an individual juror's partiality is a historical fact and the relevant question is whether jurors had such fixed opinions that they could not judge impartially) for the proposition that a trial court's finding of impartiality may be overturned only for manifest error. "Because federal habeas corpus relief does not lie for errors of state law," *Lewis v. Jeffers,* 497 U.S. 764, 780 (1990), a habeas court's review

30

is limited to whether the application of state law violated a petitioner's federal constitutional rights. *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991).

Respondent argues the juror claims are procedurally defaulted because they were presented to the Tennessee Court of Criminal Appeals under a theory based primarily on state law. Aside from any alleged procedural default and the lack of a thorough discussion of the applicable federal law, the Court concludes, after a review under both the AEDPA deference and an independent review, Petitioner is not entitled to federal habeas relief on any of his juror claims.

a.     Applicable Law

"The Sixth and Fourteenth Amendments to the Constitution guarantee a criminal defendant the right to be tried by impartial and unbiased jurors." *Miller v. Francis,* 269 F.3d 609, 615 (6th Cir. 2001) (citing *Morgan v. Illinois,* 504 U.S. 719 (1992)). In determining whether a juror was impartial and unbiased, this Court must ask: "did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton v. Yount,* 467 U.S. at 1036.

The Sixth Circuit has instructed that the applicable test for determining whether a juror's non-disclosure during *voir dire* necessitates a new trial, is the following test devised by the Supreme Court in *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548 (1984):

> To obtain a new trial, a defendant must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause. . . .The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

*Baker v. Craven,* 82 Fed. Appx. 423, 427-28 (6th Cir. 2003), *available at* 2003 WL 22455420 at *4.

In situations where a trial court erroneously failed to dismiss a juror for cause and a defendant

was compelled to use a peremptory challenge to remove the juror, the United States Supreme Court has "long recognized the role of the peremptory challenge in reinforcing a defendant's right to trial by an impartial jury[,] . . . [b]ut . . . [it has] long recognized, as well that such challenges are auxiliary; unlike the right to an impartial jury guaranteed by the Sixth Amendment, peremptory challenges are not of federal constitutional dimension." *United States v. Martinez-Salazar,* 528 U.S. 304, 311(2000) (citations omitted). In *Martinez-Salazar,* the Supreme Court held "if the defendant elects to cure such error [the erroneous refusal of a trial judge to dismiss a potential juror for cause] by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any rule-based or constitutional right." *Id.* at 307.[3] "So long as the jury that sits is impartial . . . the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Id.* (internal punctuation and citations omitted)

b.    <u>Juror Hankins, Juror Nipper, and Juror Roy Deboard</u>

As the Court understands this claim, Petitioner contends the trial court erroneously failed to excuse Jurors Hankins and Nipper for cause, forcing him to exercise two of his peremptory challenges, resulting in a biased juror, i.e, Juror Roy Deboard ("Juror Deboard"), being forced upon him. Petitioner contends the trial court erred for failing to strike Juror Hankins, on the basis he and the victim's wife were first cousins and based on him making an alleged improper comment about Petitioner, and Juror Nipper because he was second cousin to one of the State's witnesses. At the outset, to clarify any discrepancy in the state court opinions, neither Jurors Hankins nor Nipper served on Petitioner's jury [Addendum No. 1, Vol. 1, at 26-Jury Verdict with the names of the

---

[3]    Although the *Martinez-Salazar* case addressed a problem in federal jury selection, the analysis is applicable state jury selection.

32

convicting jurors; Addendum No. 1, Vol. 7, p. at 83–the excusing of Jurors Larry Hankins and Ronald Nipper from Petitioner's jury].[2]

Juror Deboard was allegedly among a group of men when some statement regarding Petitioner's case was made by Juror Hankins. As the Court understands the claim, Petitioner contends his peremptory challenges were exhausted when Juror Deboard was placed on the jury, thereby precluding him from using a peremptory challenge against Juror Deboard who Petitioner claims was not impartial.

The state appellate court's resolution of this claim will put Petitioner's argument into context. The state appellate court thoroughly analyzed this claim as follows:

> The Defendant also contends that the trial court erred when it did not strike Larry Hankins from the jury after he was accused of making improper, prejudicial comments to other jurors during voir dire and when it did not disqualify the jurors who were allegedly tainted by Hankins's statements. The Defendant also argues that he was further prejudiced because a juror tainted by Hankins's alleged improper comments was included on the jury after the Defendant had exhausted his peremptory strikes, and the Defendant was thus precluded from using a peremptory strike against this juror. The State contends that this issue is without merit, and the trial court did not abuse its discretion when it impaneled the jury.

> After a break during the jury selection process, someone told the Defendant's attorney that she overheard Hankins making a statement to other potential jurors about the case. The following dialogue ensued:

> [Defense Counsel]: Mrs. Driver just brought to my attention, a lady came up to her who is, I believe, a relative of [the Defendant's] who says during the break she heard Mr. Hankins, I think it's Larry Hankins who's a cousin to Virginia Stafford, make a comment to, perhaps another-

---

[2]    Seemingly, the appellate court was under the impression Juror Nipper remained on Petitioner's jury. The appellate court concluded that the record reflected "Nipper assured the trial court that his relations would not effect his ability to act as an impartial juror, and Defense counsel did not object to the inclusion of Nipper on the jury. Therefore, the Defendant is not entitled to relief on this issue." *State v. Troglin,* 2006 WL 2633107, at *17-18.

Mrs. Driver: Several jurors.

[Defense Counsel]: Several jurors, something about we ought to go just hang him now, something to that extent. I'd like to get that woman in here and see what she heard and who said it and who they said it to.

The Court: Do you want to ask that question of him first?

[Defense Counsel]: I'd rather get her in here. Find out exactly what she said she heard. Do you know her name? You go ahead and get her....

The Court: Ma'am, it's stated that you thought you'd overheard something.

General Pope: Do you want to swear her in your honor?

Audience Member: Yeah, I'll swear.

(Whereupon, the female audience member was sworn.)

The Court: What do you-

Audience Member: I was setting down there smoking by the ashtray on the bench and there was four of the jury members down there talking and the Hankins man, I know him just from where I see him, he said, "We might as well just tell Jimmy Pope he's guilty and hang him now and get it over with and have a party for the 4th." I thought, well, that's not fair.

The Court: Yeah, I understand. People say stuff like that.

Audience Member: He said, "We'll just go to the park and we'll fish tonight and spend the night."

The Court: Did he say anything about, I mean, like if he's be doing it for a reason or that he wanted to get it over with?

Audience Member: Get it over with and get it out and just go ahead and charge him guilty and be done with it.

The Court: Okay, we can ask-

[Defense Counsel]: What's your name, ma'am?

Audience Member: Melissa Olinger-Nipper.
[Defense Counsel]: Melissa Olinger-Nipper.

34

Olinger-Nipper: It's hyphenated. Jimmy knows me. I went to school with him, Mr. Pope.

The Court: Okay.

Olinger-Nipper: I have no reason to lie.

The Court: Who was it?

Olinger-Nipper: It was Mr. Hankins, but there was somebody setting beside me that heard the same thing.

The Court: Okay. Well, we can deal with something like that.

Olinger-Nipper: Yeah, I just didn't know if I should tell it or not, Your Honor.

The Court: Yeah, you should tell it.

Olinger-Nipper: Right, that's what I'm saying, he may not have meant it.

The Court: We'll bring him in and we'll see, let him be asked a couple of questions on it, if he's that irresponsible to say something like that and see if it bothers anybody.

[Defense Counsel]: Thank you, ma'am

The Court: Is Mr. Hankins on the original 12?

[Defense Counsel]: Right, Larry Hankins.

General Pope: Your Honor, he's the one that's a cousin to Mrs. Virginia Wright, the victim's wife.

The Court: Ask Mr. Hankins to step back here. He's on the front row of the jury box, the [farthest] away from us.

Mr. Hankins, you were overheard by someone making a comment, and it may be understandable as a joke or something, but did you make a comment let's go ahead and find him guilty so we can go out and party, did you say anything like that?

Hankins: No, sir, I did not.

The Court: Okay. We have a person that thought they overheard that. Were you there when somebody else might have said something like that? It's suppose to have been

35

just during break standing around talking with some other jurors, just some comment to the effect that we ought to hang him and get this over with so we can party tonight or something like that.

Hankins: No.

The Court: Anything like that?

Mr. Hankins: No, when I left I went to my truck to make sure no one stole anything out of it and by the time I walked back up on the steps it was about time to come back in.

The Court: So you weren't involved with any conversations with anybody?

Hankins: No.

The Court: Must have been somebody else if that's the case. You wouldn't share any such sympathy as that, I mean, as far as just wanting to get something over with?

Hankins: Oh, no, sir.

The Court: We understand how important it is for everybody. Okay, you're done, unless someone wants to ask him.

[Defense Counsel]: Did you overhear anyone out there make some sort of comment, you know, like to get this over with so we can go ahead and celebrate the 4th, or go fishing at the park, something like that?

Hankins: Now, I did make a comment to the Deboard boys, I said, "If we go to the park at least you can go fishing." Now, I did make that comment.

[Defense Counsel]: About meaning if you got put up in the motel there?

Hankins: Yeah.

[Defense Counsel]: Which Deboard boys are we talking about here? Jerry Deboard?

The Court: Nothing wrong with that. That would be a good idea. I hope you can go fishing if you're up there.

Hankins: Well, Jerry and Roy Deboard, Jr., was both standing there, you know. They's talking about they's getting ready to go fishing this morning. I said, you know, if you do get picked up at least you can go fishing, you know, which I didn't think anything was out of the ordinary. Just a couple of old country boys talking about

36

fishing.

[Defense Counsel]: That's all I have.

The Court: All right. Just take your seat back and we'll be out in just a minute. We may want to call somebody else, I don't know. Do you want to call these other folks on something like that?

Mrs. Driver: She was sitting outside she said smoking when she heard it.

[Defendant]: Bring in Jerry Deboard just to make sure.

The Court: It's obvious that was the conversation that she was overhearing.

[Defense Counsel]: Probably so. If we could bring just one of the two in he mentioned. Jerry Deboard. He's on the back row, second one from you just to confirm what he says.

The Court: You're Mr. Deboard?

Deboard: Yes.

The Court: Mr. Deboard, there has been some discussion and that's why we want to ask before we get any further in here, that there was some comment made maybe that, at least one person that was standing outside while everybody was out taking their breaks and so forth, that there was an indication that was that statement, he didn't, in his position, he didn't restate it exactly as it was told to us, but it does appear that some kind of discussion occurred about fishing or maybe even getting the trial over so they could go fishing. Were you-

Deboard: I didn't hear nothing about fishing, he was just aggravating said, I didn't hear nothing about fishing. He was aggravating saying, you know, a man get thrown out by this and that, you know, you know how people will set around and say something like that, but no, there wasn't no comment that I recall of fishing, Of course, now, I was talking to my wife, because I hadn't been able to get a hold of her and told her that so far I'd been picked to stay on the jury. There's four or five of us standing there. They may have been discussing something on fishing.

The Court: Did anybody make any-

Deboard: Now, my cousin was talking about fishing. He said if he had his depth finder hooked up last night you'uns wouldn't have got a hold of him, because he'd done already been gone this morning. Now they was a comment-

The Court: Is he on the jury, too?

Deboard: He's picked, but he's still setting out–

The Court: He's a replacement juror.

Deboard: He's still a replacement. His comment was fishing. Now, him and Larry may have been saying something about that during the time that I was talking to my wife.

The Court: Did you overhear anybody make any kind of statement that could be considered serious–

Deboard: Not nothing to me.

The Court:-That they would decide the case–

Mr. Deboard: Not nothing serious.

The Court: Just to get the heck out of Dodge.

Deboard: To me not nothing seriously, it was just, you know, people standing around talking. To me nothing seriously, no, I didn't think they was, nobody was being serious you know.

The Court: Did you hear anybody say, well, let's just go ahead and find him guilty so we can, you know, go party tonight or tomorrow night?

Deboard: Larry, he said something about, somebody else said, I think he's guilty, you know, like I said, just joking, but ... in my opinion I don't think anybody was being serious. It was just, you know, people joking.

The Court: Well, you understand that, obviously, this is vitally important to everybody here–

Deboard: Yes, sir.

The Court: And certainly to [the Defendant], and no decision ought to be made because of an impending party–

Deboard: Yes, sir.

The Court: And you wouldn't do that would you?

Deboard: No, sir. Me myself, I didn't make no kind of comment like that. I was just,

38

I was standing there on the back step back there talking to my wife, telling her to be around home close by because I may have to call her to have her bring some clothes.

The Court: Anybody else want to ask anything of this juror?

[Defense Counsel]: No.

The Court: You can go on.

(Juror Excused.)

The Court: What it sounds like to me is just good old boys talking-

[Defense Counsel]: It's good old boys mouthing off, but according to this witness, Mr. Hankins, maybe jokingly, stood up and said, We should go ahead and find him guilty so we can go fish or whatever?

The Court: I think what I should do is give them instruction just to impress upon them that, obviously, this case can't be decided based on anybody's idea, you know, including the case to meet some other schedule such as a party or something, and just kind of leave it at that.

[Defense Counsel]: I would like to go ahead for the record to make a motion to strike Mr. Hankins, though. I just feel like what he said shows prejudice on his part.

The Court: There may be some lack of maturity. I don't think it shows that he's going to do anything wrong to [the Defendant], so I'm not going to strike him....

(Whereupon, court resumed ... with all jurors present.)

Ladies and gentleman, I want to give you a little caution, all of you, and I don't think we're going to break up again until we actually have a jury selected, but I want to caution you one more time. You should not discuss this case in any way with each other during the breaks. You know, if something is said about the case it causes a person possibly to take some opinion or think you have an opinion about the case and it just might change people that are thinking, certainly, I know everybody wants to get along and it may be that someone would even say something that's kind of joking about the case, but it might be overheard by somebody who is extremely interested in the matter and it wouldn't be a joke if you were the one that was on trial or someone in their family and they heard a juror joking in some fashion about let's get it over with in a hurry or something to that effect. We had a little question about that and so I just want to tell you just generally be mindful that this is serious business and the less levity that you have about the matter the better. It doesn't mean you can't talk with each other about the time of day and so forth, but remember, especially if you

39

were out around the courthouse, you just should not say anything about the case at all and I believe that should cover the grounds....

The record reflects that Hankins was struck from the jury during the first round of challenges. The record reflects that both parties exhausted their peremptory challenges and that Roy Deboard was then placed on the jury.

The ultimate goal of voir dire is to ensure that jurors are competent, unbiased, and impartial, and the decision of how to conduct voir dire rests within the sound discretion of the trial court. *State v. Howell*, 868 S.W.2d 238, 247 (Tenn.1993). Rule 24(b) of the Tennessee Rules of Criminal Procedure governs challenges to potential jurors for cause and, in pertinent part, states, "Any party may challenge a prospective juror for cause if ... there exists any ground for challenge for cause provided by law; [or] the prospective juror's exposure to potentially prejudicial information makes the person unacceptable as a juror." However, a trial court is granted wide discretion in ruling on the qualifications of the jurors, and a trial court's decision in this regard will not be overturned absent an abuse of discretion. *State v. Kilburn*, 782 S.W.2d 199, 203 (Tenn.Crim.App.1989). Unless there has been a clear abuse of discretion, the trial court's discretion is not subject to review. *See Lindsey v. State*, 189 Tenn. 355, 225 S.W.2d 533, 538 (Tenn.1949). A trial court's finding of impartiality may be overturned only for manifest error. *Patton v. Yount*, 467 U.S. 1025, 1031, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); *State v. Howell*, 868 S.W.2d at 247.

In the case under submission, the trial court did not abuse its discretion when it refused to excuse potential juror Hankins for cause and when it did not disqualify any jurors who allegedly heard Hankins' statements.[3] The Defendant argues that inconsistencies between Hankins's and Deboard's testimony reveal that improper comments were made during voir dire that were prejudicial to the Defendant. However, this Court is unable to conclude that the trial court abused its discretion when it found that the conversation at issue had no bearing on the ability of Hankins and the Deboards to serve as impartial jurors. First, we note that Olinger-Nipper acknowledged that Hankins may not have meant the statements that she allegedly heard him make, and Jerry Deboard testified that the conversation was not serious. The record reflects that the conversation between Hankins and the Deboards revolved around their planned recreational activities and not the merits of the case at issue. The trial court determined that the conversation perhaps suggested that Hankins is immature but does not suggest that Hankins would treat the Defendant unfairly. We note that, the trial court, rather than the appellate court, is clearly in the better position to observe the demeanor, attitude, and body language of a potential juror from which

---

[3] The State argues that the Defendant waived this issue because the Defendant failed to object to the inclusion of Jerry Deboard and Roy Deboard on the jury. However, as previously discussed, a challenge that is based on actual prejudice may be made after the jury verdict. *See Akins*, 867 S.W.2d at 355 (this was footnote number one in the opinion).

the court may conclude the potential juror's capability of impartiality. *See State v. Lorenzo Malone*, No. M2003-02770-CCA-R3-CD, 2005 WL 1521788, at *3 (Tenn.Crim.App., at Nashville, June 27, 2005), no Tenn. R.App. P. 11 application filed. The record does not reflect that the trial court abused its discretion or committed "manifest error" when it impaneled the jury, therefore the Defendant is not entitled to relief on this issue.

Furthermore, we note that the Defendant has failed to show how the alleged error prejudiced his case. "[I]rrespective of whether the trial judge should have excluded the ... challenged [juror] for cause, any error in this regard is harmless unless the jury who heard the case was not fair and impartial." *Howell*, 868 S.W.2d at 248 (citing *State v. Thompson*, 768 S.W.2d 239, 246 (Tenn.1989)). The "failure to correctly exclude a juror for cause is grounds for reversal only if the defendant exhausts all of his peremptory challenges and an incompetent juror is forced upon him." *Howell*, 868 S.W.2d at 248. The Defendant in the instant case has stated that a tainted juror, Roy Deboard, was included on the jury after he exhausted all of his peremptory challenges. However, defense counsel only questioned Jerry Deboard about his exposure to Hankins's prejudicial comments. The record contains no evidence as to what Roy Deboard heard or thought about the allegedly improper comments, and we decline to speculate. Because the Defendant failed to show that an incompetent jury or impartial juror was forced upon him, we conclude that the Defendant is not entitled to relief on this issue.

*State v. Troglin,* 2006 WL 2633107, at *10-17.

Petitioner's contention that the trial court's refusal to excuse Jurors Hankins and Nipper for cause forced him to exhaust all of his peremptory challenges and resulted in an impartial juror i.e., Juror Deboard, being forced upon him, is not supported by the record. The Court has meticulously combed through the record and is unable to locate any proof that Juror Deboard harbored any prejudice or bias against Petitioner or that actual bias infected the jury that tried him. The testimony regarding what Juror Hankins said to a group of men during a break was convoluted and imprecise. Nevertheless, as a cautionary measure, the trial court addressed the situation with the full jury with a curative instruction [Addendum No. 1, Vol. 7, at 181-182].

Petitioner has not demonstrated Juror Deboard harbored any prejudice against him or that actual bias infected his jury. Juror Deboard was never presented as a witness during the motion for

41

new trial or questioned during any of Petitioner's proceedings in this case, thus he never confirmed he was actually present in the group or heard or participated in the conversation with Juror Hankins. Therefore, Petitioner's claim this juror was biased is nothing more than mere speculation. Taking account of the full record, the Court finds no evidence demonstrating Juror Deboard was biased against Petitioner. In other words, although Petitioner extinguished all of his peremptory challenges, he has not demonstrated an incompetent, biased juror was forced on him.

Under both the AEDPA deference and independent review, Petitioner's claim lacks any merit. Accordingly, Petitioner's claim relating to Jurors Hankins, Nipper, and DeBoard will be **DISMISSED** since Petitioner has failed to demonstrate Juror Deboard was not an impartial juror or the state court decision was contrary to, or an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts.

c.     Juror Ralph Angel

Petitioner contends he was deprived of his constitutional right to a trial by an unbiased jury when Juror Ralph Angel ("Juror Angel"), who became the jury foreman, failed to make full disclosure of his knowledge of Petitioner and Petitioner's involvement and conviction in the Ralph Wilkey case. Petitioner argues all of the other potential jurors who indicated they knew about his prior homicide conviction were excused for cause after further questioning by the trial court; thus Juror Angel should have been excused for cause. The state appellate court thoroughly analyzed this claims as follows:

> Juror Angel testified at the hearing on the Defendant's motion for new trial that he served as the jury foreman in this trial, that he knew the Defendant before the trial began, and that he knew of the Defendant's prior homicide conviction. He explained that he did not disclose his knowledge during voir dire because he thought that the trial court did not specifically ask him questions regarding this information. The following dialogue ensued:

General Pope: Do you remember the Judge asking some general questions at the beginning of all the jurors sitting out in the seats, did he do that?

Angel: Yes, he asked some questions.

General Pope: And the questions that he asked, if any applied to you, did you answer to those truthfully?

Angel: I didn't feel like any applied to me.

General Pope: None applied to you, okay. Then when you were picked up and put in the box were you asked more questions I assume?

Angel: Some.

General Pope: Maybe not individually, but-

Angel: Right.

General Pope: And did you answer all questions truthfully in that scenario?

Angel: Yes.

General Pope: And thats never changed since the trial or anything, right?

Angel: No.

General Pope: Your Honor, without specific questions and know which ones-

The Court: (Interposing) In one of the questions that would have been asked, do you know of any reason why you can't be fair and impartial, that is usually ask[ed] two (2) or three (3) times?

Angel: Correct.

The Court: Did you know of any reason why you couldn't be fair and impartial?

Angel: No.

General Pope: Based on anything, I mean, this is another question that's some times asked, if you did know anything about [the Defendant], could you set that aside and decide the case solely on the facts presented to you in court.

Angel: Yes.

General Pope: And is that what you did?

Angel: Yes.

The trial court: Well, at this point there's no reason to believe that it was anything more than negligent. I mean, he said he didn't think the question was asked that required his response that may be a mistake on his part, but that's not the same, you know, as intentionally doing it and then he says that it [had] no effect that he judged this case based on the facts he heard, so it seems to me like the burden would be on you to go further than just the fact that he got on the jury, maybe knowing more than he should have as far as what was trying to be elicited from him. You really need to be able to show something that would have caused him, first of all, to be getting on that thing for the purpose of convicting or give the Court at least some reason to infer from some fact. I don't have any fact in which to infer other than the threshold issue of he may not have responded correctly, so I guess-I can go ahead and rule on this one, I don't see any reason, I don't believe there's any basis upon which to grant a new trial based on what Angel has testified to and what has been established, unless you have other witnesses that somewhere are going to impeach Angel.

The essential function of voir dire is to allow for the impaneling of a fair and impartial jury through questions which permit the intelligent exercise of challenges by counsel. *Akins*, 867 S.W.2d at 355 (citing 47 Am.Jur.2d, Jury § 195 (1969)). Pursuant to Tennessee Code Annotated section 22-3-101 (2003), "Parties in civil and criminal cases or their attorneys shall have an absolute right to examine prospective jurors in such cases, notwithstanding any rule of procedure or practice of court to the contrary." Our courts, both civil and criminal, have long recognized the importance of the voir dire process and have zealously guarded its integrity. *Akins*, 867 S.W.2d at 355. Since full knowledge of the facts which might bear upon a juror's qualifications is essential to the intelligent exercise of peremptory and cause challenges, jurors are obligated to make "full and truthful answers ... neither falsely stating any fact nor concealing any material matter." *Id* . (citing 47 Am.Jur.2d, Jury § 208 (1969)).

When a juror conceals or misrepresents information tending to indicate a lack of impartiality, a challenge may be made in a motion for new trial. After establishing that the challenge may be maintained, a defendant bears the burden of providing a prima facie case of bias or partiality. *See State v. Carruthers*, 145 S.W.3d 85, 95 (Tenn.Crim.App.2003). When a juror willfully conceals (or fails to disclose) information on voir dire that reflects on the juror's lack of impartiality, a presumption of prejudice arises. *Akins*, 867 S.W.2d at 355. Failure to disclose information in the face of a material question reasonably calculated to produce the answer gives rise to a presumption of bias and impartiality. *Id*. The question must be material and one to which counsel would reasonably be expected to give substantial weight. Insignificant

non-disclosures will not give rise to a presumption of prejudice. *Furlough*, 797 S.W.2d at 653. The test is whether a reasonable, impartial person would have believed the question, as asked, called for juror response under the circumstances. *Akins*, 867 S.W.2d at 356 n. 13. Findings of fact made by the trial court are given the weight of a jury verdict. *State v. Burgin*, 668 S.W.2d 668, 669 (Tenn.Crim.App.1984).

In the case under submission, we have discovered nothing in the record which casts doubt on the trial court's conclusion that this issue does not warrant a new trial. While Angel's knowledge of the Defendant's prior conviction should have been disclosed during the voir dire process, the evidence does not indicate that Angel intentionally withheld the information. The record reflects that Angel did not think that the general questions about knowing anything about the Defendant applied to him. The Defendant has failed to prove a prima facie case of bias or partiality because he failed to prove that Angel willfully concealed or failed to disclose information on voir dire "which reflects on the juror's lack of impartiality." *Akins*, 867 S.W.2d at 355. Furthermore, we do not think that bias has been shown. The State and the Defendant stipulated at the outset of trial that the Defendant had been indicted for the murder of Ralph Wilkey and that the victim, Mike Stafford, testified at the Defendant's trial for that murder. Accordingly, at the outset of trial, all the jurors knew information similar to what Angel knew about the Defendant. We find that the degree of Angel's information other than that presented at trial was minimal and agree with the trial court's finding that such exposure did not prejudice the Defendant's case.

The Defendant contends that this case is similar to *Akins*, in which our Supreme Court granted the Defendant a new trial because a juror did not respond to questions about potential biases that were directed to the pool of potential jurors. The case under submission is distinguishable from *Akins*. The *Akins* Court noted that the juror "realized the significance of her experience yet failed to disclose them and then used them to counsel jurors about extraneous matters." *Id*. at 357. Unlike the juror in *Akins*, Angel explained that he did not think that the questions posed during voir dire pertained to him, and all of the jurors learned most of the information that Angel knew at the beginning of the Defendant's trial. Because the Defendant failed to show that Angel intentionally withheld information or that Angel's inclusion on they jury prejudiced his case, he is not entitled to relief on this issue.

*State v. Troglin,* 2006 WL 2633107, at *18 -20.

Initially the Court observes that during trial counsel's post-conviction testimony, he explained that his trial notes reflected Petitioner wanted Juror Angel left on the jury because they previously had business dealings together [Addendum No 3, Vol. 2, at 89]. Counsel further testified Petitioner later indicated that they should not have kept Juror Angel. Regardless, Petitioner was aware Juror

45

Angle knew him even if Petitioner did not know Juror Angel was aware of his prior homicide conviction. The state court did not specifically cite to Supreme Court precedent to resolve this issue. Nevertheless, under both AEDPA deference and independent review, Petitioner is not entitled to any habeas relief on this claim because he has not demonstrated Juror Angel was biased.

Prior to jury selection, trial counsel asked the trial judge how he was going to handle jury selection if a juror said they knew something about Petitioner, and the judge responded the jurors would be brought back one at a time to inquire further [Addendum No. 1, Vol. 6, at 26]. When the prospective jurors came in, the trial judge explained:

> Ladies and gentlemen, today's trial is a criminal case and as you know, the burden of proof in a criminal case is beyond a reasonable doubt. But before we get to any facts in the case, this part of the trial is designed to determine whether anybody might have a prejudice or not [sic] for some reason or other, or might for some other disqualifying matter, not be suitable to sit on this jury. I'm going to ask a few questions of you as a group and then the attorneys will ask more specific questions, probably, of you a little bit later. I think you all are a reasonably [sic] veteran panel, so you kind of know what the process is.

[Addendum No. 1, Vol. 6, at 26-27]. The judge proceeded to introduce Petitioner to the jury and asked for a show of hands of the jurors who knew "Nelson Troglin personally?" [Addendum No. 1, Vol. 6, at 28]. Then he asked if anyone knew about the case they were there to try. Numerous jurors raised their hand resulting in their subsequent individual *voir dire*. Although several of the jurors had knowledge of Petitioner's prior conviction, after the trial judge dismissed one juror because he knew about Petitioner's previous conviction, other jurors who had knowledge of the previous conviction were excused only after they indicated an inability to disregard their prior knowledge about Petitioner's murder conviction [Addendum No. 1, Vol. 6, at 37-43;57-97].

The Court is guided by the Sixth Circuit's decision in *Baker v. Craven*, 82 Fed. Appx. 423 (6th Cir. Oct. 28, 2003), *available at* 2003 WL 22455420, wherein the Sixth Circuit concluded a

46

juror's failure to reveal her knowledge of the defendant and his criminal convictions was insufficient to warrant a new trial on the ground of lack of an impartial jury. In *Baker,* the district court applied the *McDonough*[4] test to Baker's claim and concluded he had satisfied the first element i.e., the juror had failed to disclose her relationship with Baker's family in the face of direct questioning but he had not satisfied the second element, as Baker had not rebutted the state court's finding that the juror was not biased, and therefore had not demonstrated he could challenge the juror for cause. *Baker v. Craven,* 82 Fed. Appx. at 428.

Similarly, here Petitioner has satisfied the first element of the *McDonough* test, as Juror Angel failed to disclosed his familiarity with Petitioner and his knowledge of his prior conviction. The evidence demonstrates Juror Angle's omission was not the result of dishonesty but rather the result of misunderstanding. Petitioner has not rebutted Juror Angel's testimony or the trial courts finding that the omission was negligent or a mistake but not intentional. Moreover, Petitioner has not demonstrated a correct response would have provided a valid basis for a challenge for cause, as he has not rebutted the juror's testimony of his impartiality or the trial court's finding that his knowledge had no effect on his adjudication of Petitioner's case.

Once a juror indicated familiarity with Petitioner's prior conviction, the trial judge questioned the juror further to determine whether he or she harbored any bias. Almost all of those jurors acknowledged they were unable to promise their knowledge of Petitioner's prior conviction would not influence their decision in Petitioner's trial. Juror Angel's unrebutted responses, however, which

---

[4] To reiterate, to obtain a new trial, a defendant must first demonstrate a juror failed to answer honestly a material question on *voir dire*, and then show a correct response would have provided a valid basis for a challenge for cause. *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. at 556.

47

the trial judge found credible, reflects he did not consider his prior knowledge of defendant when reaching his decision in the underlying trial; he was fair and impartial; and he decided the case based solely on the facts presented to him in court [Addendum No. 1, Vol. 13, at 15]. Consequently, there is no proof before the Court a correct response by Juror Angel regarding his prior knowledge would have provided a valid basis for a challenge for cause.

In sum, Petitioner has not satisfied the second element of the *McDonough* test as he has not demonstrate that if Juror Angel "had answered the *voir dire* questions fully and accurately he could have challenged [him] for cause." *Baker v. Craven,* 82 Fed. Appx. at 429. Juror Angel testified his knowledge of Petitioner and his prior criminal conviction did not affect his decision-making in Petitioner's trial. Petitioner has not submitted any evidence to the contrary. Accordingly, Petitioner is not entitled to habeas relief on this claim and it will be **DISMISSSED**.

2.      *Jury Instruction Error*

Petitioner claims the trial court erred for failing to include a jury instruction on the lesser included offense of aggravated assault. According to Petitioner, the evidence at trial supported this instruction and the trial court violated *Beck v. Alabama,* 447 U.S. 625, 627 (1980) (the death penalty may not be constitutionally imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, when the evidence would have supported such a verdict). Although Petitioner acknowledges Tennessee does not recognize aggravated assault as a lesser included offense of attempted first degree murder, he claims the failure to so instruct the jury denied him due process and a fair trial.

On direct appeal, however, Petitioner did not raise this as a constitutional claim but rather raised it as a trial court error arguing state law. Although Petitioner included a statement in his

48

appellate brief that the Tennessee Supreme Court had quoted *Beck v. Alabama* in a case, this cursory reference did not transform this state law claim to a constitutional claim [Addendum No. 2, Doc. 1, at 21]. Petitioner based this claim on state law in his appellate brief and the appellate court denied relief based on state law. The appellate court explained aggravated assault is not a lesser-included offense of attempted first degree murder, the indictment clearly charged Petitioner with attempted first degree murder, and the trial court did not err in failing to instruct the jury on aggravated assault. *State v. Troglin*, 2006 WL 2633107, at *22-23.

"Jury instructions involving alleged errors of state law can not serve as the basis for habeas relief unless they so infuse the trial with unfairness as to deny due process of law. A jury instruction on a lesser included offense is required under the Due Process Clause only when the evidence would warrant a finding of guilt on the lesser included offense, and an acquittal on the greater offense" *Williams v. Hofbauer,* 3 Fed.Appx. 456, 458 (6th Cir. 2001), *available at* 2001 WL 133135 (citations omitted). "[D]ue process does not require an instruction on a lesser-included offense if the evidence does not support such an instruction. Instead, a *Beck* instruction is required when there was evidence which, if believed, could reasonably have led to a verdict of guilt of a lesser offense, but not the greater." *Bowling v. Parker,* 344 F.3d 487, 500 (6thCir. 2003) (internal punctuation and citations omitted). In *Beck* the Supreme Court held the failure to give a lesser included offense instruction can violate due process. In *Hopkins v. Reeves,* 524 U.S. 88, 97 (1998), the Supreme Court clarified that it has never suggested that the Constitution requires jury instructions on crimes that a state has not deemed to constitute lesser included offenses of the charged crime.

Here, the trial court instructed the jury on attempt to commit first degree murder and the lesser included offenses of attempt to commit second degree murder and reckless endangerment [Addendum

49

No. 1, Vol. 11, at 577-582]. Aside from the fact Petitioner was not entitled to an aggravated assault instruction under state law because it is not a lesser included offense, *see Demonbreun v. Bell*, 226 S.W. 3d 321, 324 (Tenn. 2007) (aggravated assault has not been deemed a lesser included offense of attempted first degree murder), he also failed to present any evidence that his shooting the victim was an aggravated assault rather than an attempted murder. The State's theory was that Petitioner attempted to kill the victim so he could not testify at Petitioner's homicide trial. Petitioner's defense was that he was innocent and not present at the crime scene. There was no credible evidence indicating this shooting was an aggravated assault. Thus, the evidence did not support an aggravated assault instruction. Notably, the jury had the option of convicting Petitioner of attempt to commit second degree murder and reckless endangerment, yet the jury convicted him of the highest offense. That verdict necessarily means the jury believed the shooting was an attempted murder.

Accordingly, because Petitioner's constitutional rights were not violated when the State court denied his request to instruct the jury on aggravated assault as the evidence did not support such an instruction, this claim will be **DISMISSED**.

## VI. CONCLUSION

Accordingly, for all the reasons discussed above, Petitioner is not entitled to an evidentiary hearing, and his § 2254 petition will be **DISMISSED** with prejudice (Court File No. 2).

A judgment will enter.

/s/ _____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**